## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Alan J. Roers,                                    File No. 10-cv-3107 (JRT/TNL)

       Plaintiff,

v.

Bank of America, and                             **REPORT &**
LandSafe Appraisal Services, Inc.,               **RECOMMENDATION**

       Defendants,

and

Cynthia L. Roers,

       Plaintiff,

v.

Countrywide Home Loans, Inc.,
Countrywide Bank, N.A., and
LandSafe Appraisal Services, Inc.,
a Minnesota corporation,

       Defendants.

---

Beau D. McGraw, McGraw Law Firm, PA, 10390 39th Street North, Lake Elmo, MN 55042 (for Plaintiff Cynthia L. Roers);

Alan J. Roers, 20 Country Road 20, Minnetrista, MN 55359 (pro se); and

Michael G. Patiuk and Jodee K. McCallum, Thompson, Coe, Cousins & Irons, LLP, 408 St. Peter Street, Suite 510, St. Paul, MN 55102 (for Defendants).

---

     This matter is before the Court, United States Magistrate Judge Tony N. Leung, on

Plaintiff Cynthia L. Roers's ("Cynthia") Motion for Partial Summary Judgment (Docket

No. 22) and Defendants Bank of America, Countrywide Home Loans, Inc., Countrywide Bank, N.A., and LandSafe Appraisal Services, Inc.'s ("LandSafe") (collectively, "Defendants"[1]) Motion for Summary Judgment (Docket No. 28).   These motions have been referred to the undersigned for a report and recommendation to the Honorable John R. Tunheim, District Judge, under 28 U.S.C. § 636 and Local Rule 72.1.   (*See* Docket No. 35.)

A hearing was held on April 4, 2012.   (*See* Docket No. 48.)   Beau D. McGraw appeared on behalf of Cynthia.   Plaintiff Alan Roers ("Alan") appeared pro se.   Michael G. Patiuk appeared on behalf of Defendants.   At the hearing, the Court asked the parties to identify certain documents in the record with corresponding docket numbers.   (Docket No. 49 at 1-2.)

By letter dated April 6, Defendants' counsel notified the Court that an incorrect copy of the mortgage for one of the properties had been inadvertently included instead of the relevant mortgage documents.   (Docket No. 49 at 1-2.)   Over Cynthia's objection, this Court subsequently ordered that the correct mortgage be filed.   (Docket No. 49 at 2.)   Defendants' counsel filed the correct documents on April 27.   (Docket No. 50.)

## I.

In July 2006, Alan and his then-wife Cynthia became interested in purchasing a home located at 20 County Road 20 South in Minnestrista, Minnesota (the "Ranch").   (*See* Docket Nos. 1, ¶ 6; 31-2 at 2.)   Alan and Cynthia visited the Ranch and were told by

---

[1] In their respective complaints, Plaintiffs have asserted all claims against all Defendants.   (*See* Docket Nos. 1, 12-3.)   Defendants have responded to all claims collectively.   (*See* Docket Nos. 5, 12-4.)   Therefore, the Court refers to Defendants collectively.

the seller and the seller's realtor that the Ranch "included the homestead, nine day sheds, and all the land that these structures occupied including approximately 25 acres in the rear and approximately 20 acres in the front," for a total of approximately 45 acres. (Docket No. 1, ¶ 7; *see also* Docket No. 12-1, ¶ 7.)  The home was located on the "back 20" acres.  (Docket No. 31-1 at 10.)   A Purchase Agreement dated July 28, 2006 ("Purchase Agreement") was executed with a purchase price of $4.1 million for property with the street address of "20 Co Rd No 20 S," being in an unplatted portion of Section 6, Township 117, Range 24, in Hennepin County (the property descriptions, collectively, the "Purchase Agreement Description").   (Docket No. 31-2 at 2.)   The Purchase Agreement was executed on a standard form approved by the Minnesota Association of Realtors with standard provisions for title examination and title insurance.  (*See* Docket No. 31-2 at 2, 4.)  The closing was set to occur in November.  (Docket No. 30 at 3.)

Prior to her marriage to Alan, Cynthia owned two parcels of property located in Edina, Minnesota (the "Benton" properties) and one parcel of property located in Minnetrista, Minnesota (the "Kingswood" property).  (Docket No. 24 at 3.)  These three properties were encompassed by a prenuptial agreement.  (Docket No. 24 at 3.)

## A. Countrywide Financing

Alan was unable to obtain financing for the Ranch on his own and began to work with Jodi Ennen of Defendant Countrywide Home Loans to finance the Ranch.  (Docket No. 12-1, ¶¶ 8-9; *see also* Docket No. 1, ¶ 8.)  At some point, someone informed Ennen of the Benton and Kingswood properties and the significant amount of equity that Cynthia had in them.  (Docket No. 1, ¶¶ 10, 13; *see also* Docket No. 24 at 3.)  Ennen

3

proposed mortgaging these properties in order to obtain financing for the Ranch.  (Docket No. 1, ¶ 13.)

Cynthia was reluctant to encumber these properties in light of their non-marital character.   (Docket Nos. 1, ¶ 11; 24 at 3; 30 at 6.)  Ennen spoke with Cynthia several times in December.  (Docket No. 31-1 at 15.)  During the first call, Ennen described herself as "a very knowledgeable mortgage banker" and stated that "[s]he had been in the industry for some time."  (Docket No. 31-1 at 15.)  Ennen discussed using the Benton and Kingswood properties to finance the Ranch and stated that "she was going to quarterback the issue and run with it."  (Docket No. 31-1 at 15.)  Cynthia told Ennen to see what she could do.  (Docket No. 31-1 at 15.)  Ultimately, Cynthia decided to assist Alan, her then-husband, by mortgaging the Benton and Kingswood properties after the realtor and Ennen told her that she could subdivide the "front 20" acres of the Ranch and sell them to pay off the mortgages on the Benton properties.  (Docket No. 31-1 at 16.)

### B. Appraisals of the Ranch

In connection with the financing, Ennen had two appraisals conducted on the Ranch.  (Docket No. 31-1 at 22.)  The appraisals were ordered from Defendants' in-house appraisal department, Defendant LandSafe, for the intended use of Defendant Countrywide Home Loans.  (*See* Docket Nos. 26 at 13-15; 31-2 at 23, 46.)  The appraisals were completed by David Langevin and Jaimee Jensen.  (Docket No. 31-2 at 23, 46.)  Langevin concluded the Ranch property consisted of 45.8 acres and appraised it at $4.1 million.  (Docket Nos. 31-2 at 23-24; 26-1 at 39.)  Jensen concluded the Ranch property consisted of 45.4 acres and appraised it at $4.2 million.  (Docket Nos. 31-2 at

4

46-47; 26-1 at 45.)  Both Alan and Cynthia testified in their respective depositions that they did not receive copies of the appraisals until *after* the closing.  (Docket Nos. 31-1 at 11; 44-1 at 10.)

### C.  Closing on the Ranch

The closing took place in December.  (Docket No. 30 at 6.)  Cynthia and Alan were in Mexico at the time.  (Docket Nos. 30 at 6; 31-1 at 10.)  Prior to their departure, however, Cynthia and Alan executed a power of attorney to their then-attorney, so that she could sign the closing and loan documents on their behalf.  (Docket Nos. 30 at 6; 31-1 at 10.)  The Ranch purchase was financed with loans on the Ranch itself, Benton properties, and Kingswood property.  (*See* Docket Nos. 31-3 at 4-5, 27-29, 54-56; 50-1 at 2-3.)  Consistent with the Purchase Agreement Description, the mortgage on the Ranch identified the mortgaged property address as "20 County Road 20," located within Section 6, Township 117, Range 24, in Hennepin County.  (*Compare* Docket No. 31-2 *with* Docket No. 31-3 at 5, 19.)

### D.  The "Front 20"

In April 2007, after living on the property for approximately four months, Alan and Cynthia noticed a "for sale" sign on what they believed to be their "front 20"—the acres that Cynthia intended to subdivide.  (Docket No. 31-4 at 8.)  Alan and Cynthia soon discovered that the Purchase Agreement they signed included only the legal description of the "back 20."  (Docket Nos. 12-1, ¶ 32; 24 at 5.)

### E.  State Court Litigation

Litigation in state district court in Hennepin County ensued.  *See, e.g.*, *Roers v. Pierce*, No. 27-cv-07-8792 (Hennepin Cnty.).  Collectively, Alan and Cynthia asserted claims of fraud, negligent misrepresentation, breach of fiduciary duty, and breach of contract against the seller, realtor, and real estate agency.  (Docket No. 37-7 at 33, 36-41, 44 (order dated May 28, 2010, in *Roers v. Pierce*, No. 27-cv-07-8792 (Hennepin Cnty.))).  At one point, the case was tried to the state court, the Honorable Lloyd Zimmerman, Fourth Judicial District Court Judge, over the course of six days.  (Docket No. 37-7 at 2, 52.)

At the end of the trial, Judge Zimmerman ruled in favor of Alan and Cynthia on the negligent-misrepresentation claim and in favor of Alan on the breach-of-fiduciary-duty claim.  (Docket No. 37-7 at 37-71, 44, 50-51.)  Judge Zimmerman issued a 50-page order, setting forth his findings of fact, conclusions of law, and order for judgment.  (Docket No. 37-7 at 2, 52.)  Judge Zimmerman made several findings concerning the sophistication of Alan and Cynthia as parties to the transactions.  Judge Zimmerman found that "[b]oth Cynthia and Alan Roers are intelligent, sophisticated and accomplished individuals . . . ," (Docket No. 37-7 at 7), characteristics he referred to throughout the order (Docket No. 37-7 at 4, 13, 17).  Judge Zimmerman also noted that Alan "is a sophisticated businessman," "who is good with numbers and complex transactions, having worked for many years as a licensed accountant and controller." (Docket No. 37-7 at 4-5.)  Similarly, Judge Zimmerman described Cynthia as "an

intelligent, sophisticated person who owned real property and who served on the Minnetrista Park Commission for almost 30 years." (Docket No. 37-7 at 13.)

Multiple appeals were taken. *See Roers v. Pierce*, No. A11-614, 2012 WL 1149330 (Minn. App. Apr. 9, 2012); *Roers v. Pierce*, No. A08-0391, 2009 WL 67061 (Minn. App. Jan. 13, 2009), *review denied* (Minn. Mar. 31, 2009); *see also Roers v. Pierce*, No. A11-237, 2011 WL 5515427 (Minn. App. Nov. 14, 2011), *review denied* (Minn. Jan. 25, 2012). Ultimately, a confidential settlement was reached with the realtor and a $40,000 payment was received from the seller. (Docket No. 30 at 8.) The seller still owns the "front 20." (Docket No. 30 at 8.) Alan and Cynthia divorced in 2009. (Docket No. 12-1, ¶ 33; *see* Docket No. 1, ¶ 26.) Alan currently resides at the Ranch. (Docket No. 31-1 at 12.)

## II.

### A. Federal Litigation

Cynthia filed this suit against Defendants Countrywide Home Loans, Countrywide Bank, and LandSafe, on July 26, 2010, alleging claims of misrepresentation, negligent misrepresentation, and rescission based upon mutual mistake. (Docket No. 1) Alan filed suit against Defendants Bank of America and LandSafe on October 10, 2010. *Roers v. Bank of Am.*, No. 10-cv-4344 (SRN/FLN) (Docket No. 1). Defendants moved to consolidate Alan's case with Cynthia's case, *id.* (Docket No. 7), and the cases were consolidated under this file number on February 4, 2011 (Docket No. 11).

### B. Summary Judgment

Cynthia has now moved for partial summary judgment on her mutual-mistake claim. (Docket No. 22.) Defendants oppose the motion. (Docket No. 39.) Defendants have moved for summary judgment on all of Cynthia and Alan's claims. (Docket No. 28.) Alan and Cynthia each oppose Defendants' motion. (Docket Nos. 35; 36.)

These motions were referred to the undersigned for a report and recommendation to the District Judge, the Honorable John R. Tunheim, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1 on February 2, 2012.

### III.

As an initial matter, Defendants have objected to, and moved to strike, Cynthia's affidavit (Docket No. 25) in support of her motion for summary judgment on the basis that the affidavit was not executed by Cynthia—the purported affiant—but by her son under a power of attorney. (Docket No. 39 at 2-3.) Cynthia subsequently filed a second affidavit with her reply memorandum, which she personally executed. (Docket No. 43.) The second affidavit is nearly identical to the first, but indicates that the realtor, rather than Ennen, made representations about the ability to subdivide the "front 20."[2] (*Compare* Docket No. 25, ¶ 11 *with* Docket No. 43, ¶ 11.) This Court need not decide whether the first affidavit was properly executed because, upon review, all of the information contained in the averments is either undisputed or supplied elsewhere in the record and, therefore, striking the affidavit would have little practical effect, and there is no prejudice to Defendants. (*See* Docket No. 42 at 6.)

---

[2] *See infra* n.4 and accompanying text.

There is no real dispute that Alan and Cynthia believed they were purchasing both the "front 20" and the "back 20"; it is this very belief that gave impetus to this litigation. (*Compare* Docket No. 25, ¶¶ 14, 21-23, 30 *with* Docket Nos. 44-7 at 4, 7-9; 31-1 at 10.) The background information concerning when Alan and Cynthia became interested in purchasing the Ranch, the representations concerning the character of the land, and when the Purchase Agreement was signed can be found in the depositions of Alan and Cynthia as well as the Purchase Agreement itself.  (*Compare* Docket No. 25, ¶¶ 2-3 *with* Docket Nos. 44-1 at 5; 31-1 at 4; 31-2 at 2-21.)  Alan and Cynthia's depositions also provide testimony on the attempted financing through M&I Bank and how they came into contact with Ennen and Defendants.  (*Compare* Docket No. 25, ¶¶ 4-6 *with* Docket Nos. 44-1 at 5-6; 31-1 at 4-6.)

In addition, the depositions of Alan and Cynthia contain testimony concerning Cynthia's non-marital properties—the Benton and Kingswood properties, the existence of a prenuptial agreement regarding these properties, and Cynthia's reluctance to encumber them.  (*Compare* Docket No. 25, ¶¶ 7-8, 10, 18 *with* Docket Nos. 44-1 at 7-9, 11; 31-1 at 7-9.)  Cynthia also testified that the Benton properties were not encumbered, and the initial mortgage on the Kingswood property is in the record.  (*Compare* Docket No. 25, ¶¶ 7-8, 10, 18 *with* Docket Nos. 44-1 at 7; 31-3 at 80-93.)  Similarly, Cynthia testified that Ennen proposed a financing arrangement for the Ranch that utilized the Benton and Kingswood properties.  (*Compare* Docket No. 25, ¶ 9 *with* Docket No. 44-1 at 7-8; *see also* Docket Nos. 26 at 9-12; 31-1 at 8-9.)

Likewise, in her deposition, Cynthia testified that the realtor and Ennen stated that Cynthia could subdivide the "front 20" in order to recoup her marital investment. (*Compare* Docket No. 25, ¶ 11 *with* Docket Nos. 44-1 at 7-9; 31-1 at 10; *but see* Docket No. 26 at 11.)   As indicated above, both Alan and Cynthia stated in their respective depositions that they did not receive copies of the appraisals until after the closing; even so, the appraisals themselves are part of the record.  (*Compare* Docket No. 25, ¶¶ 12-13, 23 *with* Docket Nos. 44-1 at 9-11; 31-1 at 11; 31-2 at 24-69; 26-1 at 39.)

Further, Cynthia testified in her deposition that she mortgaged the Benton and Kingswood properties based on the purported ability to subdivide the "front 20." (*Compare* Docket No. 25, ¶¶ 16, 25 *with* Docket No. 44-1 at 9, 11.)   Copies of the mortgages subsequently placed on these properties as well as the initial Kingswood mortgage are all part of the record and speak for themselves as to the amount borrowed and terms of the loans.  (*Compare* Docket No. 25, ¶¶ 17-18, 29 *with* Docket Nos. 31-3 at 26-93; 50-1 at 2-25.)   There is no dispute that the closing documents for the Benton and second Kingswood mortgages as well as the mortgage for the Ranch were all signed in late December 2006 and the documents themselves are in the record.  (*Compare* Docket No. 25, ¶ 19 *with* Docket Nos. 31-3 at 2-24; 50-1 at 2-25; *see also* Docket Nos. 44-1 at 8; 31-1 at 10.)

It is not contested that Alan and Cynthia first became aware that they did not purchase the property they thought they did in April 2007 after seeing a "for sale" sign on the "front 20."  (*Compare* Docket No. 25, ¶ 20 *with* Docket No. 31-3 at 10; *see also* Docket No. 1, ¶ 24.)   The facts of Alan and Cynthia's divorce and the accompanying

10

transfer of the Ranch to Alan are similarly undisputed.  (*Compare* Docket No. 25, ¶ 26 *with* Docket Nos. 44-1 at 3; 31-1 at 4.)

As for the remaining averments, while it does not appear to be contested that the Ranch is currently in foreclosure[3] (*see* Docket No. 36 at 1), it is not the proceedings themselves, but the consequences of foreclosure that are of import here.  These consequences, namely, a declaration of default on the Benton and Kingswood mortgages in the event that there is a default on the Ranch, can be equally gleaned from the mortgage documents themselves.  (*Compare* Docket No. 25, ¶¶ 27-28, 30 *with* Docket Nos. 31-3 at 27, 40, 54, 68; 50-1 at 2, 10.)

Each of the mortgages contains a provision that the "[b]orrower's default or breach *under any note or agreement in which Lender has an interest shall be a breach under [this] Security Instrument* and Lender may invoke any of the remedies permitted by the Security Instrument."  (Docket Nos. 31-3 at 40 (5412 Benton) (emphasis added)); 31-3 at 68 (5416 Benton) (same); 50-1 at 10 (Kingswood) (same).)  The lender in each case was Defendant Countrywide Home Loans.  (Docket Nos. 31-3 at 27, 54; 50-1 at 2.) Defendant Countrywide Bank was the lender on the mortgage for the Ranch.  (Docket No. 31-3 at 3.)  Given the affinity of Defendants, it is therefore possible that the Benton and Kingswood properties may be at risk should default be declared on the Ranch.

Finally, Paragraphs 24 and 15 are argument.  (*See* Docket No. 25, ¶¶ 15, 24.) Paragraph 31 is merely reiterating the remedy that Cynthia seeks in her Complaint.

---

[3] Alan's memorandum in opposition to Defendants' motion for summary judgment contains a request that this Court "immediately *Stay* a foreclosure action currently underway on the invalid and faulty mortgage lien documents." (Docket No. 36 at 1.)  To the extent this request is separate from the remedies requested in Alan's Complaint, (*see* Docket No. 12-1, Remedies ¶¶ 1-4), such request is not properly before this Court.  *See* Fed. R. Civ. P. 7(b).

(*Compare* Docket No. 25, ¶ 31 *with* Docket No. 1, Remedies ¶¶ 1-3.)  Paragraph 31 is hearsay.  *See* Fed. R. Civ. P. 56(c); Fed. R. Evid. 801(c), 802.

Because all of the averments in the challenged affidavit are undisputed, contained in the record elsewhere, or not factual averments, this Court recommends that Defendants' motion to strike be denied as moot.

## IV.

"Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact."  *Gazal v. Boehringer Ingelheim Pharms., Inc.*, 647 F.3d 833, 837 (8th Cir. 2011) (citing Fed. R. Civ. P. 56).  "'The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'"  *DeVary v. Countrywide Home Loans, Inc.*, No. 09-cv-1146 (PJS/FLN), 701 F. Supp.2d 1096, 1103 (D. Minn. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Where, as here, the parties have cross-motions for summary judgment, the Court views the record in the light most favorable to the plaintiff when considering the defendant's motion and in the light most favorable to the defendant when considering the plaintiff's motion.  *Weber v. Travelers Home & Marine Ins. Co.*, No. 10-2142 (RHK/LIB), 801 F. Supp.2d 819, 825 (D. Minn. 2011).

"A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case."  *Gazal*, 647 F.3d at 837-38.  "The party requesting summary judgment is entitled to judgment as a matter of law if the non-movant fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." *Vaughn v. Wallace*, 496 F.3d 908, 910-911 (8th Cir. 2007) (quotations omitted).

### A. Misrepresentation Claims

Both Cynthia and Alan have brought claims for negligent misrepresentation. Cynthia has brought an additional claim for fraudulent misrepresentation. Given the fact that Defendants have moved for summary judgment on all of the misrepresentation claims and the significant overlap of the claims themselves, the Court will discuss all of the misrepresentation claims together.

> To succeed in a fraudulent misrepresentation claim under Minnesota law, a plaintiff must prove:
>
>> (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffer[ed] pecuniary damage as a result of the reliance.

*Trooien v. Mansour*, 608 F.3d 1020, 1028 (8th Cir. 2010) (quoting *Hoyt Props., Inc. v. Prod. Res. Group, LLC*, 736 N.W.2d 313, 318 (Minn. 2007)). The elements of fraudulent and negligent misrepresentation differ only with respect to the scienter requirement. *Id.* "In a negligent misrepresentation claim, a plaintiff must show that the defendant supplied false information for the guidance of others in their business transactions and in doing so

fail[ed] to exercise reasonable care or competence in obtaining or communicating the information." *Id.* (quotation omitted).

### 1.  Proper Pleading under Fed. R. Civ. P. 9(b)

Defendants first argue that Cynthia and Alan's misrepresentation claims do not meet the pleading requirements of Fed. R. Civ. P. 9(b).   (Docket No. 30 at 13-14.) Defendants assert that neither Plaintiff has set forth well-pleaded facts providing the specific circumstances of the alleged misrepresentation; rather, Cynthia and Alan have only supplied vague and conclusory allegations about what was said, when the statements were made, and by whom.  (Docket No. 30 at 13-14.)

"Under Minnesota law, any allegation of misrepresentation, whether labeled as a claim of fraudulent misrepresentation or negligent misrepresentation is considered an allegation of fraud which must be pled with particularity." *Trooien*, 608 F.3d at 1028; *see* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").

> To satisfy the rule, a plaintiff must plead "such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001) (internal quotation marks omitted).   While the level of particularity required depends on the nature of the case, the plaintiff "must typically identify the who, what, where, when, and how of the alleged fraud." *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007) (internal quotation marks omitted).  The purpose of the particularity requirement is to allow defendants to respond specifically and quickly to damaging fraud allegations. *United States ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003) (citation omitted).

14

*Petsche v. EMC Mortg. Corp.*, No. 10-cv-4750 (JRT/TNL), 830 F. Supp.2d 663, 673-74 (D. Minn. 2011).  "In other words, a plaintiff must plead the time, place and contents of the false representations, the identity of the individual who made the representations and what was obtained thereby."  *Cox v. Mortg. Elec. Registration Sys., Inc.*, No. 10-4626 (DSD/SER), 794 F. Supp.2d 1060, 1066 (D. Minn. 2011) (quotation omitted).

As best as this Court is able to discern, the alleged misrepresentations at issue in this litigation can be separated into two categories: the ability to subdivide the "front 20" and statements relating to the value of the Ranch.  The Court will consider the sufficiency of each Plaintiff's complaint in turn.

### a.  Cynthia's Complaint

With respect to Cynthia's claims for fraudulent and negligent misrepresentation based on the ability to subdivide the "front 20," the Court concludes that these claims are not pleaded with sufficient specificity.  While it is clear that the ability to subdivide is the misrepresentation at issue, (*see* Docket No. 1, ¶¶ 12, 20), it is not clear from Cynthia's Complaint *who* made the alleged misrepresentation.[4]  Cynthia alleges that "she was repeatedly told," (Docket No. 1, ¶ 12); "she had been told by *representatives* of Countrywide," (Docket No. 1, ¶ 20 (emphasis added)); and "Defendants falsely and misleadingly represented . . . . ," (Docket No. 1, ¶ 29), but at no point does Cynthia identity which of the Defendants made the alleged misrepresentation and, more specifically, which of the Defendants' employees made the statements at issue.

---

[4] Elsewhere in the record, Cynthia herself is inconsistent as to who made the misrepresentation.  (*Compare* Docket Nos. 25, ¶ 11; 42 at 6; 44-1 at 9 (Ennen) *with* Docket Nos. 24 at 3; 43, ¶ 11 (realtor) *with* Docket No. 44-1 at 7 (both Ennen and realtor)).

Although Cynthia identifies Ennen as "a loan representative of Countrywide," (Docket No. 1, ¶ 8), Cynthia does not specifically allege that Ennen made the subdivision statements at issue, or when. "[P]ermitting fraud allegations to stand that do not even identify the speaker . . . of the fraud[] would eviscerate Rule 9(b)'s requirement that fraud be pled with particularity. This is particularly true when there are multiple defendants . . . ." *Stark v. Monson*, No. 07-4373 (MJD/AJB), 2008 WL 189959, at *9 (D. Minn. Jan. 22, 2008).

Further, this is not a situation in which Cynthia was not a party to the alleged misrepresentations. *See id.* at *8 (noting that pleading fraud allegations with particularity may be impracticable where plaintiff is not a party to the communication). Cynthia alleges that these misrepresentations were made *directly to her*, thereby inducing her to encumber the Benton and Kingswood properties. (*See* Docket No. 1, ¶¶ 12, 20, 29, 33.) Because Cynthia's allegations of fraudulent and negligent misrepresentation concerning the ability to subdivide the "front 20" do not identify the speaker who made the misrepresentation, or when, they have not been pleaded with sufficient particularity under Fed. R. Civ. P. 9(b), and therefore summary judgment should be granted to Defendants on these claims.

As for Cynthia's claims for fraudulent and negligent misrepresentation concerning the value of the Ranch, the Court concludes that these claims have been pleaded with sufficient particularity. Upon examination of Cynthia's complaint, the Court is able to identify (1) the misrepresentation at issue—the Ranch's value being in excess of $4 million (*see* Docket No. 1, ¶¶ 18-19, 27, 29-32, 38-41); (2) who made the

16

misrepresentation—LandSafe and its appraisers Langevin and Jensen, and Countrywide and Ennen through the hiring of LandSafe (*see* Docket No. 1, ¶¶ 14, 16-19, 22); (3) when the misrepresentation occurred—just prior to the closing on the Ranch (*see* Docket No. 1, ¶¶ 14, 16, 22-23); and (4) what was obtained/accomplished as a result of the misrepresentation—Cynthia agreed to, and thus Defendants were able to, encumber non-marital property based on the purported value of the Ranch (*see* Docket No. 1, ¶¶ 11, 19, 22, 27, 29-35, 38-8, 40-42, 44).

Accordingly, Defendants' motion for summary judgment on the basis of insufficient pleading under Fed. R. Civ. P. 9(b) concerning Cynthia's claims for fraudulent and negligent misrepresentation based on the value of the Ranch should be denied.

### b. Alan's Complaint

In contrast to Cynthia's Complaint, Alan's Complaint identifies Ennen as the person who made the misrepresentation concerning the ability to subdivide the "front 20." (Docket No. 12-1, ¶¶ 12-13.) Alan alleges contact with only one loan officer—Ennen. (Docket No. 12-1, ¶ 8.) Given the liberal construction of pro se complaints, Defendants were put on notice as to the identity of "it[s] representative"/"[t]he Bank of America and Countrywide representative" who "represented that Plaintiff would be able to subdivide the front 20 acres." (Docket No. 12-1, ¶ 38.) *See Stone v. Harry*, 364 F.3d 912, 915 (8th Cir. 2004) ("When we say that a pro se complaint should be given liberal construction, we mean that if the essence of an allegation is discernible, even though it is not pleaded with legal nicety, then the district court should construe the complaint in a

way that permits the layperson's claim to be considered within the proper legal framework.").

With respect to Alan's claim for negligent misrepresentation based on the ability to subdivide the "front 20,"[5] Alan's Complaint identifies (1) the misrepresentation—the ability to subdivide (Docket No. 12-1, ¶¶ 13, 21, 38, 45); (2) who made the misrepresentation—Ennen (*see* Docket No. 12-1, ¶¶ 8, 12-13, 38); (3) when the misrepresentation occurred—just prior to the sale of the Ranch (*see* Docket No. 12-1, ¶¶ 13, 41); and the benefit obtained/action induced as result of the misrepresentation—mortgages were placed on Benton and Kingswood properties with Alan as a listed borrower (Docket No. 12-1, ¶¶ 11, 14, 21, 26-27, 38, 41) and the only person[6] personally obligated to pay the sums secured by the mortgages.  The Court concludes that Alan has pleaded his negligent representation claim with the requisite particularity under Fed. R. Civ. P. 9(b).

Like Cynthia's claims for fraudulent and negligent misrepresentation concerning the value of the Ranch, the Court concludes that Alan's claim for negligent

---

[5] Alan's negligent misrepresentation claim concerning the ability to subdivide the "front 20" is based on statements that Ennen made to Cynthia, not directly to Alan.  (*See* Docket Nos. 31-1 at 60-10; 36 at 6, 8, 14-15; *see also* Docket No. 12-1, ¶¶ 10-11, 13-14.)  Defendants have not challenged Alan's standing to bring this claim.  "A party who negligently supplies false information for the guidance of others may be liable to third parties if they are foreseeable recipients of the information and justifiably rely upon it to their detriment."  *Baker v. Surman*, 361 N.W.2d 108, 111 (Minn. App. 1985).  Given Alan and Cynthia's marital status at the time the Ranch was purchased, the pooling of resources necessary to purchase the Ranch (Alan's down payment and Cynthia's properties), and Cynthia's hesitation to encumber the Benton and Kingswood properties, it is foreseeable that Cynthia would discuss Ennen's statement concerning the ability to subdivide the property with Alan.  (*See* Docket No. 31-1 at 8; *see also* Docket No. 37-7 at 9, 18.)

[6] A central fact to this lawsuit is that the Benton and Kingswood properties were all *pre*marital assets, belonging solely to Cynthia.  (*See* Docket Nos. 1, ¶¶ 9, 21, 27, 34-35, 40, 43-44; 12-1, ¶¶ 10-11, 14, 26-27, 41-42, 44-45, 19; 24 at 3, 30 at 5-7.)  Alan is the only signatory on *both* the mortgages and notes for the Benton properties and the mortgage and home equity credit line agreement for the Kingswood property.  (Docket Nos. 31-3 at 27, 37, 51; 54, 64, 78; 50-1 at 2, 6, 14, 21.)  By the terms of these instruments, only Alan is therefore personally obligated to pay the sums secured by the mortgages.  (Docket Nos. 31-3 at 34, 61; 50-1 at 2, 14, 20.)

misrepresentation with respect to the value of the Ranch has been plead with sufficient particularity.  Upon examination of Alan's complaint, the Court is able to identify (1) the misrepresentation at issue—the value of the Ranch being in excess of $4 million (*see* Docket No. 12-1, ¶¶ 17-19, 21-23, 25, 27, 32, 34-35, 37, 42, 46, 49); (2) who made the misrepresentation—LandSafe and its appraisers Langevin and Jensen, and Countrywide Home Loans and Ennen through the hiring of LandSafe (*see* Docket No. 12-1, ¶¶ 12, 15, 16, 27, 37); (3) when the misrepresentation occurred—just prior to the closing on the Ranch (*see* Docket No. 12-1, ¶¶ 12, 16, 26-27, 30); and (4) what was obtained/accomplished as a result of the misrepresentation—Alan agreed to purchase the Ranch based on its purported appraisal value (*see* Docket No. 12-1, ¶¶ 8, 20-21, 24-25, 28, 64-41-42, 49).  Accordingly, Defendants' motion for summary judgment on the basis of insufficient pleading under Fed. R. Civ. P. 9(b) as to Alan's claim for negligent misrepresentation based on the value of the Ranch should be denied.

### 2.  Cynthia's Misrepresentation Claims (Counts I and II)

Turning to the individual misrepresentation claims, Cynthia has offered no response to Defendants' motion for summary judgment concerning her negligent and fraudulent misrepresentation claims.  Defendants correctly point out that, in her responsive memorandum, Cynthia only addresses Defendant's arguments regarding her mutual-mistake claim—no counter arguments are presented with respect to any of the misrepresentation claims.  (Docket No. 45 at 5; *see* Docket No. 35 at 1-7.)  "It is well established that a party concedes an issue by failing to address it in an opposing brief."

*Am. Registry of Radiologic Technologists v. Bennett*, No. 09-933 (RHK/FLN), 655 F. Supp.2d 944, 946 n.2 (D. Minn. 2009).

Thus, in addition to this Court's conclusion that Cynthia's misrepresentation claims concerning the ability to subdivide the "front 20" were not pleaded with sufficient particularity, this Court recommends that Defendants' motion for summary judgment be granted with respect to these claims as well as the negligent and fraudulent misrepresentation claims concerning the value of the Ranch because Cynthia has not shown that a genuine issue of material facts exists concerning these claims.

### 3.  Alan's Negligent Misrepresentation Claim (Count I)

"[F]raud, in its broadest form, can be understood to encompass actions that result from both deceit and negligence."  *Florenzano v. Olson*, 387 N.W.2d 168, 173 (Minn. 1986); *see id.* at 173-74 (distinguishing between fraudulent intent and negligence). Although it goes almost without saying, a claim for negligent misrepresentation requires *negligence* on the part of the misrepresenter.  *See id.* at 173-74. Accordingly, this Court finds it helpful to return to the underlying principles of negligence to analyze Alan's claim for negligent misrepresentation.

### a.  Negligence

Negligence results from the failure to exercise reasonable care under the circumstances. *Domagala v. Rolland*, 805 N.W.2d 14, 22 (Minn. 2011).  "To recover for a claim of negligence, a plaintiff must prove (1) the existence of a duty of care, (2) a breach of that duty, (3) an injury, and (4) that the breach of the duty of care was a proximate cause of the injury."  *Id.*  "'Before someone can be found negligent it must be

established that that person owed a duty to the injured person.'" *Presbrey v. James*, 781 N.W.2d 13, 16-17 (Minn. App. 2010) (quoting *Zimmer v. Carlton Cnty. Co-op. Power Ass'n*, 483 N.W.2d 511, 513 (Minn. App. 1992)). "Because a defendant cannot breach a nonexistent duty," *Domagala*, 805 N.W.2d at 22, this Court begins with the threshold inquiry of whether Defendants owed a duty of care to Alan.

### b. No Duty Owed by Banks to Customers Generally

"[A] duty is an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *Casa de Cambio Comdiv, S.A. De C.V. v. Fed. Reserve Bank of Minneapolis*, 115 F.3d 618, 620 (8th Cir. 1997) (quotation omitted). "The existence of a duty of care is a question of law . . . ." *Domagala*, 805 N.W.2d at 22. As a general rule,

> when a bank transacts business with a depositor or other customer, it has no special duty to counsel the customer and inform him of every material fact relating to the transaction-including the bank's motive, if material, for participating in the transaction-unless special circumstances exist, such as where the bank knows or has reason to know that the customer is placing his trust and confidence in the bank and is relying on the bank so to counsel and inform him.

*Klein v. First Edina Nat'l Bank*, 293 Minn. 418, 422, 196 N.W.2d 619, 623 (1972). Therefore, absent special circumstances showing that Ennen knew or had reason to know that Alan had placed his trust and confidence in her, Ennen—and thus Defendants—owed no duty to Alan.

### c.  No Fiduciary Duty Owed to Alan (Count III)

The absence of any general duty owed by Defendants brings the Court to Alan's claim for breach of fiduciary duty.  "[U]nder Minnesota law a fiduciary relationship exists when confidence is reposed on one side and there is resulting superiority and influence on the other; and the relation and duties involved in it need not be legal, but may be moral, social, domestic, or merely personal." *Hope v. Klabal*, 457 F.3d 784, 791 (8th Cir. 2006).

Typically, "[a] lender-borrower relationship does not give rise to fiduciary duties absent special circumstances." *H. Enters. Int'l, Inc. v. Gen. Elec. Capital Corp.*, No. 4-91-679 (DSD), 833 F. Supp. 1405, 1421 (D. Minn. 1993); *see also Ming'ate v. Bank of Am., N.A.*, No. 11-1787 (ADM/TNL), 2011 WL 4590431, at *5 (D. Minn. Sept. 30, 2011) ("In Minnesota, lenders bear no fiduciary duty to borrowers.").  "Unless a special relationship exists between the bank and the borrower, where the bank has reason to know of the customer's trust and reliance, 'when a bank transacts business with a depositor or other customer, it has no special duty to counsel the customer.'" *Ming'ate*, 2011 WL 4590431, at *5 (quoting *Klein*, 196 N.W.2d at 623 (Minn. 1972)).  While the existence of a fiduciary relationship is typically a question of fact, "[t]he court is not precluded, however, from resolving the issue on summary judgment if the undisputed facts establish that no fiduciary duty exists." *H. Enters. Int'l*, 833 F. Supp. at 1422.

Alan argues that a special relationship was formed because Ennen stated that she would "quarterback" the deal "and thus was 'looking out' for [Alan and Cynthia's] interests."  (Docket No. 36 at 11.)  Defendants contend that the relationship with Alan

"was strictly one of lender and creditor."  (Docket No. 30 at 10.)  Defendants contend that they supplied Alan with borrowing options and there is no admissible evidence to show either that Defendants knew or should have known that Alan was placing his trust and confidence in them or that Alan asked Ennen or any one of Defendants' employees to look out for his interests.  (Docket No. 30 at 10-11.)

Viewing the evidence in the light most favorable to Alan, this Court concludes that, as a matter of law, no fiduciary relationship existed between Alan and Defendants. Alan spoke with Ennen after another lender's financing fell through and explained what he had tried to arrange previously.  (Docket No. 31-1 at 6; *see* Docket No. 26 at 6.) Ennen asked questions about collateral properties and the debt, if any, on those properties.  (Docket No. 31-1 at 6.)  Ultimately, Ennen stated that she believed the transaction could be accomplished and gave Alan some financing options.  (Docket Nos. 31-7; 26 at 9.)  Ennen simply sought information in an attempt to procure financing for the Ranch and expressed her commitment to working with Alan and Cynthia—things any lender would do.  *See Ming'ate*, 2011 WL 4590431, at *5 (no fiduciary duty created with borrower based on bank's purported "special expertise and knowledge and a more sophisticated understanding of loan servicing").  Under the circumstances of this case and in light of Alan's professional experience and business aptitude, Ennen's statement that she would "quarterback" the deal cannot be seen as anything more than the use of puffery to accomplish a sale.  *See Bernstein v. Extendicare Health Servs., Inc.*, No. 08-5874 (DWF/JSM), 607 F. Supp.2d 1027, 1031 (D. Minn. 2009) ("Puffery includes exaggerated blustering or boasting and vague, subjective statements of superiority.").

Furthermore, Alan has not shown that there is a genuine issue of material fact as to the existence of a fiduciary relationship through Ennen's statements that she needed to use internal appraisers to value the property and the appraisals had to show a certain property value before the loan would be approved.  (Docket No. 36 at 11-12.)  A lender's internal protocols do not create a duty of care to the mortgagor.  *See Baker v. Surman*, 361 N.W.2d 108, 111 (Minn. App. 1985).  Moreover, Alan and Cynthia testified in their depositions that they did not review the appraisals until *after* the closing.  (Docket Nos. 31-1 at 11; 44-1 at 10.)  It should be noted, too, that Alan's claim is certainly not helped by the language in each appraisal that "[t]he intended user of this appraisal report is the lender/client."  (Docket Nos. 31-2 at 28, 51.)

The *lender* needs to determine whether the property value is proportionate to the loan requested; presumably, the buyer has already made a determination of the property's value in executing the purchase agreement with a stated purchase price, along with customary mechanisms to review title, buy an owner's policy, and pay for whatever additional survey, ingress, egress and other title endorsements the buyer and/or buyer's counsel deem prudent.  *See Baker*, 361 N.W.2d at 111 (noting that although homebuyer-mortgagor is a foreseeable recipient of mortgagee's appraisal, the primary and predominate objective of mortgagee's appraisal is for the protection of the mortgagee).

Although erroneous, the appraisals showed that there was sufficient value in the property for the lender to lend.  (Docket Nos. 31-1 at 11; 26 at 16.)  Ennen—the lender—was satisfied with the appraisals and told Alan and Cynthia that the loan on the Ranch

24

would be approved.  (Docket No. 31-1 at 11.)  Alan and Cynthia then elected to use Defendants to finance their purchase.  Alan has "failed to demonstrate special circumstances beyond a typical lender-borrower relationship sufficient to establish that a fiduciary relationship existed."  *H. Enters. Int'l*, 833 F. Supp. at 1422.

This Court concludes that, absent special circumstances, a lender is not liable to a borrower for errors in the lender's evaluation of the property in deciding whether to lend funds to the borrower.  *See Ming'ate*, 2011 WL 4590431, at *5; *Baker*, 361 N.W.2d at 111.  To hold otherwise would be to create retrospectively a higher duty from mortgagee to mortgagor, and indirectly render banks guarantors of property values.[7]  As a matter of law, this Court concludes that Defendants owed no fiduciary duty to Alan and are entitled to summary judgment on Alan's breach-of-fiduciary-duty claim.

### d.  Other Considerations

Moreover, any representations—negligent or otherwise—by Defendants as to the character of the Ranch could not, as a matter of law, have reasonably induced Alan to purchase the property.  Alan had already signed the Purchase Agreement at time he sought financing with Defendants.  (*See* Docket No. 31-1 at 9.)  It is undisputed that the "front 20" was not included in the legal description provided in the Purchase Agreement.  (Docket Nos. 1, ¶ 25; 12-1, ¶ 32; *see* Docket No. 30, at 15.)  The Purchase Agreement and its accompanying addendum and disclosures were signed on July 28, 2006.  (Docket No. 31-2 at 2-21.)  The closing on the Ranch took place on December 29, 2006.  Alan

---

[7] Although brought about by different circumstances at different price points, Alan and Cynthia's unfortunate situation is similar to the heart-rending experience currently suffered by so many homeowners whose property values are now worth less than the mortgages they owe.

came to Defendants seeking *financing* for the property he agreed to purchase in the July 28 agreement.  Defendants provided him with that financing.  Defendants gave Alan what he asked for; it can hardly be said that Defendants breached a duty of care in doing so.

Arguably, Defendants were just as duped as Alan.  Defendants lent funds based on an understanding that both the "front 20" and the "back 20" would serve as security for the loan.  Defendants had no greater duty to tell Alan that the property was not worth $4.1 million than Alan had to tell them.  To the extent the character of the Ranch property was different than Alan believed it to be, Alan's remedy was against those who misrepresented the nature of the property at the time it was purchased, not those who financed the purchase.[8]  *See B.F. Goodrich Co. v. Mesabi Tire Co.*, 430 N.W.2d 180, 183 (Minn. 1988) (noting that Minnesota subscribes to the out-of-pocket rule, where purchaser's "damages are the difference between the actual value of the property received and the price paid for the property, along with any special damages naturally and proximately caused by the fraud prior to its discovery, including expenses incurred in mitigating the damages," and that this rule works best in real estate transaction in which the purchaser relied on a fraudulent representation of the seller).

Because Alan cannot show that his relationship with Defendants was anything more than a typical lender-borrower relationship and banks have no special duty to counsel their customers absent special circumstances,[9] this Court recommends that

---

[8] Indeed, as Judge Zimmerman found in the state action against the seller and the realtor, "[t]he harm that the Roers have suffered is buying the [Ranch] without the front 20."  (Docket No. 37-7 at 44.)

[9] The Court notes that there are conflicting statements in the record as to what Ennen knew about the "front 20." (*See, e.g.*, Docket Nos. 36 at 2, 6, 14; 26 at 5-6; 37-5 at 3-5.)  Because the Court concludes that Defendants did not owe a duty to Alan, any such conflicting statements are immaterial, and they do not create a special duty.

summary judgment be granted in favor of Defendants on Alan's negligent-misrepresentation claim.

### B.  Mutual Mistake/Rescission Claims

Alan and Cynthia have each brought claims for rescission based on mutual mistake.  (Docket Nos. 1, ¶¶ 46-52; 12-1, ¶¶ 51-56.)  Defendants have moved for summary judgment on both of their claims.  (Docket No. 30 at 16-20.)  Cynthia has crossed moved for summary judgment on her mutual-mistake claim.  (Docket No. 24.)

A claim for "'[m]utual mistake' consists of a clear showing that both contracting parties misunderstood the fundamental subject matter or terms of the contract."  *Sheng v. Starkey Labs., Inc.*, 117 F.3d 1081, 1084 (8th Cir. 1997).

> Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake . . . .

*SCI Minn. Funeral Servs., Inc. v. Washburn-McReavy Funeral Corp.*, 779 N.W.2d 865, (Minn. App. 2010) (quoting Restatement (Second) of Contracts § 152(1)).  "Before a misconception will render a contract voidable, it must be more th[a]n an error about the monetary value of the consideration; it must go to the very nature of the deal."  *Sheng*, 117 F.3d at 1084.

The comments to section 152 of the Restatement (Second) of Contracts state that

> [a] party cannot avoid a contract *merely because both parties were mistaken as to a basic assumption on which it was made*.  He must, in addition, show that the mistake has a material effect on the agreed exchange of performances.  It is not enough for him to prove that he would not have made the

> contract had it not been for the mistake. He must show that the resulting imbalance in the agreed exchange is so severe that he cannot fairly be required to carry it out.

Restatement (Second) of Contracts § 152 cmt. c (emphasis added).

As applied to this case, Defendants agreed to loan Alan and Cynthia a sum of money and needed security for the money they loaned.  Alan and Cynthia agreed to execute mortgages on certain property in favor of Defendants in exchange for that sum of money.  Alan, Cynthia, and Defendants all shared the basic assumption that the "value" of the transaction was over $4 million.  In one sense, Alan and Cynthia were not mistaken in that $4.1 million was the Purchase Agreement price for which they sought and received financing; and Defendants were not mistaken about the amount they loaned out and needed repaid.  In another sense, all parties were mistaken as to the value of the transaction.  Alan and Cynthia borrowed money to purchase property that was not worth $4.1 million, and Defendants loaned money on property that was not worth $4.1 million.

The fundamental subject matter of all of the transactions between Alan and Cynthia and Defendants, however, whether involving the Ranch, the Benton properties, or the Kingswood property, was financing: Alan and Cynthia wanted to borrow money and Defendants had money to lend.  The fundamental subject matter was not the character of the Ranch land; the character of the Ranch land was the fundamental subject matter of the Purchase Agreement.

Ennen testified, both at her deposition and the state court trial, that she only looked at the *value* of the property in the appraisals.  (Docket Nos. 26 at 4; 26-2 at 43.)  While Cynthia argues that this testimony makes clear that both she "and Countrywide were

operating under the mistaken belief that the entire 45 acres of the [Ranch] were being sold and financed," (Docket No. 24 at 8), this conflates the character of the property with its value. There is no intrinsic number of acres that equate to a value of $4.1 million. The parties believed that the Ranch was worth over $4 million; it was not. A mutual mistake as to value does not entitle a party to rescind the transaction. *Sheng*, 117 F.3d at 1084.

Because (1) the fundamental subject matter of Alan and Cynthia's transactions with Defendants was to procure financing, (2) they were able to obtain such financing, and (3) any mistake only went to the value of the Ranch property and not to the loan amount received and to be repaid, this Court recommends that Defendants' motion for summary judgment be granted as to Cynthia and Alan's mutual mistake claims and that Cynthia's motion for summary judgment be denied.

Because this Court concludes that Defendants are entitled to summary judgment on Alan and Cynthia's mutual mistake claims for the aforementioned reasons, the Court need not consider Defendants' alternative argument based on the doctrine of election of remedies.

**V.**

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1.  Defendants' Motion for Summary Judgment (Docket No. 28) be **GRANTED**;

2.   Defendants' motion to strike be denied; and

3.  Cynthia's Motion for Partial Summary Judgment (Docket No. 22) be **DENIED**.


Dated:  June ___18___, 2012                          _____*s/ Tony N. Leung*_____
                                                     Tony N. Leung
                                                     United States Magistrate Judge
                                                     for the District of Minnesota


                                                     *Roers v. Countrywide Home Loans, Inc. et al.*
                                                     File No. 10-cv-3107 (JRT/TNL)


Pursuant to Local Rule 72.2(b), any party may object to this Report and

Recommendation by filing with the Clerk of Court and by serving upon all parties written

objections that specifically identify the portions of the Report to which objections are

made and the basis of each objection.  This Report and Recommendation does not

constitute an order or judgment from the District Court and it is therefore not directly

appealable to the Circuit Court of Appeals.  Written objections must be filed with the

Court before **July 3, 2012**.